# 22-2178

## United States Court of Appeals
## for the Second Circuit

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Appellant,*

v.

NIAGARA-WHEATFIELD CENTRAL SCHOOL DISTRICT,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of New York

**AMENDED BRIEF FOR APPELLANT**

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant
The Capitol
Albany, New York  12224
(518) 776-2015

Dated: January 13, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.............................................................ii

STATEMENT OF JURISDICTION..........................................2

ISSUES PRESENTED ...............................................................3

STATEMENT OF THE CASE ....................................................3

    A.   Statutory Background ....................................................3

    B.   The Present Suit ............................................................5

    C.   The Decision Below ....................................................14

SUMMARY OF ARGUMENT ...................................................15

STANDARD OF REVIEW...........................................................17

ARGUMENT .............................................................................18

POINT I

    THE STATE PLAUSIBLY ALLEGED STANDING TO SUE AS PARENS
    PATRIAE..............................................................................19

POINT II

    THE STATE WAS ENTITLED TO LEAVE TO AMEND ITS COMPLAINT .........27

CONCLUSION ........................................................................31

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982) ........................................................................ 20, 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2007) ............................................................................... 18

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ................................................................................. 4

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*,
947 F.3d 342 (6th Cir. 2020) ................................................................... 4

*Connecticut v. Cahill*,
217 F.3d 93 (2d Cir. 2000) ..................................................................... 20

*Connecticut v. Physicians Health Servs. of Conn., Inc.*,
287 F.3d 110 (2d Cir. 2002) .............................................................. 19, 20

*Cresci v. Mohawk Valley Cmty. Coll.*,
693 F. App'x 21 (2d Cir. 2017) ............................................................... 29

*Davis v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999) ................................................................................. 4

*Doe v. East Haven Bd. of Educ.*,
200 F. App'x 46 (2d Cir. 2006) ................................................................. 4

*Jin v. Metro. Life Ins. Co.*,
310 F.3d 84 (2d Cir. 2002) ................................................................ 18, 27

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ................................................................... 29

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020) ................................................................ 17, 18

## Cases (cont'd) Page(s)

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) .................................................................. 18

*Patel v. Contemp. Classics of Beverly Hills*,
  259 F.3d 123 (2d Cir. 2001) .................................................................. 18

*People by Abrams v. 11 Cornwell Co.*,
  695 F.2d 34 (2d Cir. 1982) ....................................................... 21, 22, 23

*People by Vacco v. Mid Hudson Med. Grp.*,
  877 F. Supp. 143 (S.D.N.Y. 1995) ....................................................... 26

*People v. Peter & John's Pump House, Inc.*,
  914 F. Supp. 809 (N.D.N.Y. 1996) ....................................................... 26

*Pratt v. Indian River Cent. Sch. Dist.*,
  803 F. Supp. 2d 135 (N.D.N.Y. 2011) .................................................... 5

*Ronzani v. Sanofi S.A.*,
  899 F.2d 195 (2d Cir. 1990) .................................................................. 29

## FEDERAL STATUTES

20 U.S.C.
  § 1681 ..................................................................................................... 3, 4
  § 1687 ........................................................................................................ 4

28 U.S.C.
  § 1291 ........................................................................................................ 2
  § 1331 ........................................................................................................ 2
  § 1367 ........................................................................................................ 2

## FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 12 ....................................................... 1, 14, 17, 18

Fed. R. Civ. P. 15 ............................................................... 17, 27

34 C.F.R. § 106.31 ......................................................................... 4

## PRELIMINARY STATEMENT

The State of New York, through Attorney General Letitia James, brought this Title IX action against the Niagara-Wheatfield Central School District in response to the district's consistent refusal to protect students from known, pervasive acts of sexual harassment and gender-based bullying. The State, acting as *parens patriae*, sought injunctive and declaratory relief to remedy the school district's practice of ignoring student and parent complaints of sexual harassment and gender-based bullying, including in over 30 documented incidents in the last several years. The school district's inaction harms not only the victims of harassment, but also the entire student body—particularly female students—who are implicitly told that they will not be protected from sexual or gender-based harm while on school grounds.

The United States District Court for the Western District of New York (Sinatra, J.) granted the school district's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), holding that the State was not entitled to act as *parens patriae*, and thus lacked standing to sue, because it had not demonstrated that the school district harmed a substantial segment of the population. The court's holding was

mistaken. The State plausibly alleged both direct and indirect harm affecting all current and future students, and thus provided a sufficient—indeed ample—basis to sue as *parens patriae* under this Court's precedent. To the extent the State's allegations were insufficient to survive a motion for judgment on the pleadings, however, the district court abused its discretion when it denied the State an opportunity to amend its complaint to cure the supposed deficiency. The Court should thus reverse the district court's judgment and remand for further proceedings.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the State's Title IX claim under 28 U.S.C. § 1331 because the complaint asserted a federal claim. And the district court had supplemental jurisdiction over the State's state-law claim under 28 U.S.C. § 1367(a) because the state-law claim arose from the same case or controversy as the federal claim.

This Court has jurisdiction under 28 U.S.C. § 1291 because this is a timely appeal from the district court's final judgment. (JA 139.)

## ISSUES PRESENTED

1.    Whether the allegations of the State's complaint plausibly alleged that actions of the defendant school district harmed a substantial segment of the population, as required to establish standing under the doctrine of *parens patriae*.

2.    Alternatively, whether the district court erred by denying the State leave to amend its complaint to cure any pleading deficiencies.

## STATEMENT OF THE CASE

**A.    Statutory Background**

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex by any educational program receiving federal financial assistance. 20 U.S.C. § 1681(a). Under the law, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," except for certain circumstances not

relevant here.[1] *Id.* The law extends to "all of the operations" of a school or other covered educational entity. 20 U.S.C. § 1687. And the regulations implementing Title IX broadly forbid educational institutions from "limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity" on the basis of sex. 34 C.F.R. § 106.31(b)(7).

The purpose of Title IX and its implementing regulations is to "avoid the use of federal resources to support discriminatory practices" and "provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). Accordingly, courts—including this Court—interpret Title IX broadly to include claims against educational institutions that fail to take appropriate action against known acts of student-on-student sexual harassment or gender-based bullying. *See, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999); *Doe v. East Haven Bd. of Educ.*, 200 F. App'x 46, 47-49 (2d Cir. 2006); *Chisholm v. St. Marys City Sch. Dist.*

---

[1] The law excepts, among other things, certain religious educational organizations, institutions training individuals to enter military service, universities that were historically single-sex, social fraternities and sororities, the Boy Scouts and Girl Scouts, and father-son or mother-daughter activities held at a subject institution so long as comparable activities are offered to both sexes. *See* 20 U.S.C. § 1681(a)(1)-(9).

4

*Bd. of Educ.*, 947 F.3d 342, 351 (6th Cir. 2020); *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 152 (N.D.N.Y. 2011).

## B. The Present Suit

In 2021, the State of New York, by Letitia James as Attorney General, brought this suit against the Niagara-Wheatfield Central School District to remedy violations of Title IX. (JA 9.) In its first amended complaint, the operative complaint here,[2] the State alleged that the school district "repeatedly and egregiously failed" its students by ignoring "complaints by students of rape, assault, sexual harassment, and gender-based bullying" and failing to take "any meaningful action against perpetrators or to protect victims from future harassment." (JA 9-10.) In support of its allegations, the State included details about four student exemplars who suffered significant negative consequences from the school district's ongoing deliberate indifference to acts of sexual assault, sexual harassment, and gender-based bullying against female students.

---

[2] The State filed its initial complaint on June 23, 2021, and filed a pre-answer first amended complaint on August 24, 2021, with defendant's consent. (*See* JA 2-3.)

5

1. <u>TG</u>

The State first described the school district's inaction to protect a female student, TG, from ongoing harassment at school after she was raped by a male student in May 2018. (JA 12.) The State alleged that TG's mother met with the principal of Niagara-Wheatfield Senior High School before the start of the following school year—when both TG and her assailant would be seniors at the school—to ensure that TG would be protected from her rapist. TG's mother provided documentation establishing that TG had reported the incident to the police, her assailant had been arrested, and TG had obtained a restraining order to prevent the assailant from coming near TG outside of school. (JA 12.) The school's principal promised that TG would not have contact with her assailant, but provided no concrete plan to effectuate that promise. (JA 12.)

When the 2018-2019 school year began, TG's rapist went out of his way to encounter TG, including by standing outside of her classroom and glaring at her. (JA 13.) Despite TG telling the school counselor about these repeated, intentional interactions, the school district did nothing, and TG suffered a panic attack. (JA 13.) On multiple occasions, TG's rapist stood in the doorway of her class and stared at her, causing her to

begin skipping classes. (JA 14.) TG was also harassed by classmates with, for example, a snapchat showing a picture of TG's rapist captioned "your boyfriend," texts insinuating that TG had enjoyed having sex with her rapist, and taunting comments telling her to "watch her back." (JA 13.) TG and her mother reported these behaviors and showed the harassing messages to the assistant principal, principal, and superintendent, but none of them took any action. (JA 13-14.) The continued bullying affected TG's mental health, and she began missing school. (JA 13.)

In May 2019, TG's rapist pled guilty to third-degree rape. (JA 14.) TG's mother advised the school of the guilty plea. (JA 14.) The principal responded that TG's rapist would nonetheless be allowed to attend all school functions, including prom and graduation, making further contact between TG and her rapist virtually inevitable. (JA 14.) TG's mother posted on social media about the school district's failure to protect her daughter, sparking concern from other parents that their children had attended school with a rapist all year long and causing students at the high school to organize a walkout to protest how the school had handled the incident. (JA 14.) Rather than respond to student concerns, the school's principal attempted to discourage the walkout, calling the action

"not civil," and suspended several students who did participate. (JA 14-15.)

While the school district ultimately expelled TG's rapist, it did so only after the school year concluded and after the walkout brought nationwide attention to the school district's failure to protect TG. (JA 15.)

2.  CC

The State next described the school district's failure to take action to protect a female student named CC who experienced persistent bullying for years for her non-conformance to gender stereotypes. In its complaint, the State alleged that CC was severely bullied beginning in the seventh grade for dressing in hoodies and other clothing regarded as stereotypically male. (JA 15.) CC repeatedly reported this harassment to the school counselor, who initially let her come to his office to do work when she was bullied, but eventually stopped helping her and told her to go back to class. (JA 15.) After two years of persistent, severe bullying, CC began to wear more feminine clothes in an attempt to stop the harassment. (JA 15.) The bullying did not stop, however; instead, her harassers criticized her more feminine clothing, calling her "fat" and

"ugly," and on one occasion saying she was a "slut" who should go kill herself. (JA 15-16.)

Throughout the year, CC and her family reported these harassing incidents to the school counselor, but the school district failed to create a safety plan or otherwise meaningfully protect CC from ongoing harassment and bullying. (JA 16.) As a result, CC began missing school more frequently and had to see a counselor and psychiatrist to help with the anxiety and depression she experienced. (JA 16.) In December 2019, CC stopped going to school altogether because of the harassment and requested to transfer to a neighboring school. (JA 16.) The school district not only refused to approve a transfer, but also called Child Protective Services to report that CC was not attending school. (JA 16.) As of August 2021, when the first amended complaint was filed, the situation remained unresolved. (JA 16.)

3.   <u>AS</u>

The State additionally described the gender-based harassment experienced by AS, a female high school student in the school district. In Spring 2020, AS was bullied by members of the school's football team after one of the players created and distributed a TikTok featuring

9

messages mocking AS. (JA 16.) In the video, one boy commented that AS's sweatpants made her look like she had male genitalia, and another stated that he would not have sex with her. (JA 16.) After the video was distributed, female students who were friends with the football players began harassing AS, including by performing a chant about AS during a pep rally and displaying a poster that said, "We don't want you." (JA 17.) After the pep rally, five girls physically attacked AS, hitting her in the head 11 times. (JA 17.)

Following that assault, AS's mother went to the acting principal to discuss what happened and ask how the school district would protect AS. (JA 17.) The principal stated that it would be in AS's interest to avoid going to the winter dance scheduled to take place the next day, yet he permitted the five girls who attacked AS to attend. (JA 17.) Over the next few days, AS's mother repeatedly contacted the school and superintendent to discuss what steps the school district would take to protect AS, but no one responded to her. (JA 17.) The girls who assaulted AS were not punished, and AS's family ultimately located a private school for her to attend because she was too afraid to continue attending the high school in the defendant school district. (JA 17.)

10

4.   <u>LW</u>

Finally, the State described the school district's failure to protect a second-grade student, LW, from harassment after she was sexually assaulted in her housing complex by a classmate in 2017. (JA 17.) LW's mother reported the assault to law enforcement; she also informed the school principal and district superintendent about the incident, and she requested that the school district keep LW and her assailant apart. (JA 18.) The superintendent told LW's mother that the district would not do anything, noting only that the assailant was also entitled to an education, and thus that LW and her mother would need to move if LW's mother wanted to assure no future contact between LW and her assailant at school. (JA 18.)

LW subsequently faced harassment from both her assailant and other students. LW's assailant harassed her at school where they had lunch in the same place every day, touching her arm and telling her that she was "damaged goods" and that no one would ever love her. (JA 18.) On one occasion, the assailant followed LW into the bathroom at school, and a teacher observed LW run out. (JA 18.) LW's mother attempted to contact the superintendent and principal about the matter, but the

11

superintendent did not return her phone calls and the principal did nothing. (JA 18.) Even after LW's assailant ultimately moved out of the school district, other students continued to bully LW about the sexual assault, calling her "damaged goods" and saying that LW enjoyed the sexual assault. (JA 18.) LW experienced physical manifestations of stress from the assault and ongoing harassment and had to attend counseling for over two years. (JA 18.)

In addition to describing in detail the experiences of these four students whom the school district failed to protect from ongoing sexual harassment and gender-based bullying, the State alleged that the school district had received reports of 30 other incidents of similar sexual harassment or gender-based bullying and similarly failed to take adequate steps to protect the students involved. (JA 10, 12, 19.) Specifically, the State alleged that the school district failed to create a safety plan or make other efforts to protect the victimized students going forward. (JA 10, 19.) The State alleged that the school district even refused to accept offers for educational programming and confidential advocacy from the Rape Crisis Program at the YWCA for the Niagara Frontier, despite the facts that every other school district in Niagara

County makes use of the program and that the YWCA had contacted the school district multiple times to offer these services. (JA 19.) And the State alleged that the school district's failure to protect its students had widespread consequences for the entire student body in that the district "has shown students—particularly young women—that the very people charged with ensuring their safety in school will not protect them in their time of need." (JA 10.)

After the school district filed its answer (JA 22-32), but before the completion of discovery, the school district moved for judgment on the pleadings under Rule 12(c) (JA 39-47). The district court stayed discovery pending resolution of the school district's dispositive motion. (JA 5-6; *see also* Decision and Order, *People of the State of New York v. Niagara-Wheatfield Central School District*, 21-cv-00759 (W.D.N.Y. Apr. 6, 2022), ECF No. 38.) The magistrate judge to whom the matter was assigned thereafter issued a report and recommendation finding, among other things, that judgment on the pleadings should be granted in the school district's favor because the State lacked standing to sue as *parens patriae*. (JA 48-83.) Both parties filed objections to the report and recommendation, with the State expressly requesting that, if the district

13

court agreed with the report and recommendation, it should grant the State leave to amend the complaint to add further allegations establishing the school district's widespread, ongoing practice of demonstrating deliberate indifference to gender-based harm. (JA 109-110.)

## C. The Decision Below

The district court adopted the report and recommendation to the extent it found that the State failed to establish *parens patriae* standing. The district court held that the State's reliance on four "factually distinct instances of discrimination and a general policy or practice of Defendant's alleged failure to respond adequately to such discrimination" was insufficient to show that a substantial segment of the population had been injured. (JA 135.) The district court seemingly ignored the State's allegations of over 30 documented incidents of sexual harassment and gender-based bullying, adopting the report and recommendation's conclusion that these allegations were "conclusory." (JA 136; *see also* JA 63-64.) And the district court denied the State leave to amend its complaint, stating that the State had not sufficiently identified "how any

additional exemplars would address the deficiency discussed above."
(JA 137.)

The State timely filed this appeal. (JA 140.)

## SUMMARY OF ARGUMENT

The State has standing to sue the Niagara-Wheatfield Central School District for its conduct alleged here under the doctrine of *parens patriae*. It is undisputed that the State satisfies two of the three requirements to sue as *parens patriae*: it has a quasi-sovereign interest in protecting the health and safety of students exposed to sexual harassment and gender-based bullying, and students could not obtain complete relief through private suit. The only issue here is whether the State sufficiently alleged that it satisfied the remaining requirement: that the school district's deliberate indifference to known instances of sexual harassment and gender-based bullying injured a "substantial segment" of the State's population.

The district court was mistaken in holding that the State's complaint failed to satisfy this "substantial segment" requirement. Using the experiences of four students as exemplars, the State alleged that the school district consistently refuses to take adequate, or indeed any, steps

15

to protect female students who complain about sexual harassment or gender-based bullying that causes significant emotional distress. The State further alleged that the school district had failed to respond adequately to documented instances of sexual harassment or gender-based bullying against another 30 students in just the last several years, and that if the district's inaction is allowed to continue, students will continue to be directly injured by harassment and bullying as a result. Moreover, the State plausibly alleged that the school district's indifference to gender-based harm has widespread consequences for all district students, especially female students, by making them fear for their safety while at school. The State illustrated these widespread consequences with specific allegations of the words and actions of concerned students and parents following the school district's refusal to protect one particular student, TG, from sexual harassment. Together, these allegations were more than sufficient to show that a substantial segment of New York's population was affected by the school district's practices and thus to confer standing on the Attorney General to sue as *parens patriae*.

Alternatively, if the State's allegations were insufficient to survive a motion for judgment on the pleadings, then the district court abused its discretion by denying the State leave to amend its pleadings to cure the supposed deficiency. The district court held that the State failed adequately to demonstrate a consistent school-district practice affecting a substantial segment of the population by failing to provide enough examples to establish any such practice. Yet the court denied the State's request to amend its complaint to add exactly what the court wanted: additional allegations to show a consistent practice with widespread injury to students, including details about the school district's inadequate response to 30 additional documented instances of sexual harassment and gender-based bullying. In denying this request, the district court failed to abide by Federal Rule of Civil Procedure 15's direction that leave to amend be freely given when justice so requires.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant a motion for judgment on the pleadings *de novo*. *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion

for failure to state a claim." *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). To survive a Rule 12(c) motion, a complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Lynch*, 952 F.3d at 74 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007)). Because standing is challenged on the basis of the pleadings, a reviewing court must accept as true all material allegations in the complaint and draw all references in the light most favorable to the plaintiff. *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 114 (2d Cir. 2002).

This Court reviews the denial of leave to amend a complaint for abuse of discretion, unless the denial was based on an interpretation of law, in which case review of the legal conclusion is *de novo*. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012); *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

## ARGUMENT

The present case should have proceeded in the district court. The State plausibly alleged that it had standing to sue the school district as *parens patriae* for the widespread harm being done to students in the district by the recurring failure to take adequate steps to protect students

from sexual harassment and gender-based bullying of which district officials were aware. But even if the district court were correct that the State failed to sufficiently allege standing, the court erred in denying leave to amend the complaint to correct this purported deficiency by setting forth additional detailed allegations demonstrating that a substantial segment of the population was injured by the school district's ongoing deliberate indifference to known incidents of sexual harassment and gender-based bullying.

## POINT I

### THE STATE PLAUSIBLY ALLEGED STANDING TO SUE AS PARENS PATRIAE

The State adequately demonstrated in its complaint that it had standing to sue the school district as *parens patriae* for injuries to the entire student body caused by the district's failure to protect students from known instances of sexual harassment and gender-based bullying.

As the Supreme Court has explained, States have standing to protect three types of interests in federal court: (1) proprietary interests, similar to those of a private party, (2) sovereign interests, such as those involved in disputes over boundaries or water rights, and (3) "quasi-

sovereign" interests, which give rise to suits as *parens patriae*. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601-02 (1982); *see also Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000). The doctrine of *parens patriae* "allows states to bring suit on behalf of their citizens in certain circumstances" and "derives from the common-law principle that a sovereign, as 'parent of the country,' may step in on behalf of its citizens to prevent 'injury to those who cannot protect themselves.'" *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 119 (2d Cir. 2002) (quoting *Snapp*, 458 U.S. at 600-01).

To establish *parens patriae* standing, a State must allege three things: (1) a "quasi-sovereign interest" apart from the interests of private parties affected by the dispute, (2) an inability of individuals to obtain complete relief through private suit, and (3) a concrete injury to a "substantial segment" of the State's population. *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 39-40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc decision reversing denial of attorneys' fees to state); *see also Snapp*, 458 U.S. at 602, 607 (discussing first and third requirements of *parens patriae* standing). Only the third requirement is at issue here.

20

Courts have not attempted to "draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior" in order to constitute a "substantial segment." *Snapp*, 458 U.S. at 607. However, "the indirect effects of the injury must be considered" along with any direct injuries suffered by individuals. *Id.* This is particularly so when a case involves alleged discrimination, which carries a "universal sting" felt by all members of the disfavored group. *See id.* at 609; *11 Cornwell Co.*, 695 F.2d at 40. Courts must also look to how many people are likely to be injured in the future by a harmful practice that is allowed to continue. *11 Cornwell Co.*, 695 F.2d at 39-40.

Thus, in *11 Cornwell*, this Court held that the State had standing as *parens patriae* to sue a group of neighbors who conspired to prevent the sale of land to the State to be used as a home for intellectually disabled New Yorkers. 695 F.2d at 37, 39-40. In holding that the case affected a substantial segment of the population, the Court recognized that the residential center would have housed only eight to ten intellectually disabled individuals. *Id.* at 39. The Court reasoned, however, that the misconduct would also affect any number of individuals

21

who could reside at the center at some point in the future, as well as those individuals currently living in institutions, which would remain more crowded absent development of the residential center. *Id.* And the Court reasoned further that the case affected a substantial segment of New York's population because "were this kind of incident to be tolerated and left without redress, countless others would be affected" by similar behavior by other bad actors. *Id.* at 39-40.

Similarly here, the defendant school district's practices harm a substantial segment of the population. As the State alleged in its complaint, the school district's ongoing deliberate indifference to sexual harassment and gender-based bullying has directly injured at least the 34 individuals that the State has thus far identified, causing the harms detailed at length in the accounts of TG, CC, AS, and LW. (JA 10, 12-19.) And, as in *11 Cornwell*, the number of individuals who will be injured "in years to come" by the practices challenged—here, the school district's deliberate indifference to sexual harassment and bullying—is substantial. 695 F.2d at 40. Indeed, the school district's failure to act sends a message to other students that sexual harassment and gender-based bullying will be "tolerated and left without redress" and thereby

emboldens more students to engage in such harmful practices. *See id.* at 39-40.

Moreover, the State plausibly alleged that the school district's deliberate indifference harms more than just the current and future victims of sexual harassment. All students within the school district— most especially female students—are negatively affected by the school district's indifference to sexual harassment, because that indifference communicates that the school district will do nothing to protect students from sexual assault, harassment, or gender-based bullying and thus leaves them fearful for their safety. (JA 10, 19.) This impact on other students is reflected by the decision of many students to organize a walkout protesting the school district's failure to protect female students from harassment, as detailed in the State's complaint. (JA 9-10, 14-15.) As one concerned student put it, the school district was "[a]llowing all of us girls to be in danger." (JA 15.) And as the complaint plausibly alleged, parents echoed the concern that their children were in danger as a result of the school district's inaction after learning that "a rapist was in school with their children all year long." (JA 14.) Taken together, these allegations were sufficient to demonstrate that a "substantial section" of

23

the population was injured by the school district's deliberate indifference and that the State had standing to sue as *parens patriae*.

The district court erroneously concluded that the complaint relied *only* "on examples of factually distinct instances of discrimination," and therefore that the State had not established "that Defendant's policy or practice affects a substantial segment of the population." (JA 135-36.) That is simply not so. The State's complaint alleged a consistent practice of ignoring complaints about persistent sexual harassment and gender-based bullying that harmed the student body as a whole.

To be sure, the State used the experiences of four students as exemplars of the kinds of behaviors that the school district allowed to continue unchecked. And the allegations about those four exemplar students alone would have been sufficient to demonstrate that a significant segment of the population was harmed both directly and indirectly by the school district's conduct. After all, as to all four students, the school district ignored repeated complaints of ongoing harassment. (JA 13-15, 17-18.) The school district failed to create concrete safety plans or take any meaningful actions to address the specific situations of the victimized students. (JA 12, 16-18.) In several instances, school district

24

officials did more than fail to respond to complaints of harassment; the officials on occasion took concrete steps that harmed female students who reported harassment, including by preventing them from participating in school activities, preventing them from moving to schools in which they would feel more comfortable, and suspending students who demonstrated support for female victims. (JA 13, 15-17.) Even after these four students suffered repeated acts of harassment and bullying and the school faced public scrutiny from the national media, the school district refused to take even the minimal step of accepting the offer for educational programming and confidential advocacy from the Rape Crisis Program, even though every other school district in the county had opted to use those services. (JA 19.) And as a result of the school district's inaction, district students felt unsafe. The detailed allegations in the complaint about these four specific student victims of sexual harassment and gender-based bullying thus adequately demonstrated a consistent practice and policy of deliberate indifference to that conduct on the part of the school district.

The State did not rely solely on its allegations about the four student victims, however. To the contrary, the State also alleged that,

notwithstanding that there were substantiated reports of similar sexual harassment, assault, and gender-based bullying against another 30 students in the school district, the school district still had "not created a single written safety plan or taken any documented effort to keep students safe." (JA 10; *see also* JA 12, 19.) Furthermore, these additional allegations were not bare conclusory allegations, and the district court was required to accept the truth of them on a motion for judgment on the pleadings. As district courts have repeatedly recognized, the Attorney General may use a "small group of 'aggrieved persons' as exemplars for a larger class" because the State cannot reasonably determine and detail in a complaint the circumstances of each person harmed by an action that affects a substantial segment of the population. *See, e.g.*, *People by Vacco v. Mid Hudson Med. Grp.*, 877 F. Supp. 143, 147 (S.D.N.Y. 1995); *People v. Peter & John's Pump House, Inc.*, 914 F. Supp. 809, 813 (N.D.N.Y. 1996).

Because the State plausibly alleged a consistent pattern by the school district of deliberate indifference to sexual harassment and gender-based bullying of students that directly and indirectly harmed the

entire student body, judgment on the pleadings in the school district's favor was improper.

## POINT II

### THE STATE WAS ENTITLED TO LEAVE TO AMEND ITS COMPLAINT

If the State did not sufficiently allege that the school district engaged in a consistent, widespread practice of ignoring sexual harassment and gender-based bullying, the district court should have granted the State's request for leave to amend the complaint to cure that alleged pleading deficiency. This Court has counseled that "[l]eave to amend should be freely given," unless the district court has a "good reason" to deny the request, such as "futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

Here, the district court abused its discretion by denying leave to amend. The district court concluded that the State had not sufficiently alleged a widespread and consistent practice by the school district of ignoring sexual harassment and gender-based bullying. And in doing so,

27

it adopted the magistrate's report and recommendation, which discounted allegations of more than 30 similar incidents as "conclusory." (JA 136; *see also* JA 63-64.) The district court should have granted the State an opportunity to amend its complaint to add more detailed allegations about those additional incidents, as well as the school district's failure to adequately respond to them. Given the opportunity, the State would have alleged, for example, that, over and over, the school district took no proactive measures to protect student victims, and student aggressors received little to no disciplinary sanction for demonstrated instances of harassment and bullying. The State also would have added detailed allegations about incidents that occurred after the filing of the complaint. (*See* JA 109.) Together, these allegations would have cured the alleged deficiency in the State's complaint by alleging in detail the consistency of the school district's refusal to protect numerous victims of sexual harassment and gender-based bullying, as well as the pervasive harm this refusal caused to students.

Moreover, no good cause existed to deny leave to amend the pleadings. The district court did not suggest that amendment would be futile, nor was there any suggestion that the State had acted in bad faith

28

or unduly delayed proceedings. The district court did not suggest that the school district would be unduly prejudiced by amendment. Indeed, at the time the State requested leave to amend, the parties had not yet even engaged meaningfully in discovery on the case, and the sole purpose of amendment would have been to demonstrate standing rather than change the substantive causes of action. And while the State had, with defendant's consent, filed a first amended complaint early in the litigation before the school district filed an answer, that fact did not justify the district court's refusal to give the State an opportunity to cure the pleading deficiencies it purported to identify in its decision. *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198-99 (2d Cir. 1990) ("[W]e hold that the dismissal of the amended complaint without leave to amend was an abuse of discretion."); *see also Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) ("[T]he court's denial of leave to replead, simultaneously with its decision that the complaint was defective, effectively deprived Cresci of a reasonable opportunity to seek leave to amend."); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015) (same).

Rather than identify any "good cause" that would warrant denying leave to amend, the district court reasoned that the State had not identified "how any additional exemplars would address the deficiency" in its complaint. (JA 137.) That conclusion was incorrect. The State stated that it would plead further allegations "regarding the District's policy and practice of deliberate indifference" (JA 109), which was the basis on which the district court granted judgment on the pleadings in the school district's favor. In light of the district court's conclusion that the State's exemplars had not established that the school district's policy or practice affected a sufficiently substantial segment of the population (JA 136), detailed allegations regarding a significant number of additional instances of sexual harassment and gender-based bullying, the school district's ongoing deliberate indifference to these incidents, and the consequences of this deliberate indifference for students would likely cure the supposed deficiency in the complaint.

Accordingly, the district court abused its discretion in failing to give the State leave to amend its complaint to cure the alleged deficiency in demonstrating the State's standing to sue as *parens patriae*.

30

## CONCLUSION

The district court's decision should be reversed and the case remanded.

Dated:  Albany, New York
        January 13, 2023

                Respectfully submitted,

                LETITIA JAMES
                  *Attorney General*
                  *State of New York*
                Attorney for

By:   */s/ Alexandria Twinem*
                Alexandria Twinem
                Assistant Solicitor General

BARBARA D. UNDERWOOD        The Capitol
  *Solicitor General*               Albany, New York 12224
ANDREA OSER                 (518) 776-2015
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alexandria Twinem, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains **5,879** words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

 /s/ Alexandria Twinem