# 22-2178

## United States Court of Appeals
## for the Second Circuit

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Appellant,*

v.

NIAGARA-WHEATFIELD CENTRAL SCHOOL DISTRICT,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of New York

**REPLY BRIEF FOR APPELLANT**

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Plaintiff-Appellant
The Capitol
Albany, New York 12224
(518) 776-2042

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

Dated: May 23, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................ii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT ...................................................................................... 3

POINT I

THE STATE PLAUSIBLY ALLEGED STANDING TO SUE AS *PARENS PATRIAE* BECAUSE A SUBSTANTIAL SEGMENT OF THE POPULATION IS INJURED BY THE SCHOOL DISTRICT'S FAILURE TO PROTECT VICTIMS .......................................................................................... 3

POINT II

THE STATE WAS ENTITLED TO LEAVE TO AMEND ITS COMPLAINT ......... 16

POINT III

THIS COURT SHOULD NOT CONSIDER THE MERITS OF THE STATE'S CLAIMS IN THE FIRST INSTANCE ........................................................ 20

CONCLUSION ................................................................................... 35

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) .................................................................. 21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982) ........................................................................ 5, 13

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) .............................................................. 15

*Bruneau v. S. Korthright Cent. Sch. Dist.*,
163 F.3d 749 (2d Cir. 1998) .............................................................. 25

*Cresci v. Mohawk Valley Cmty. Coll.*,
693 F. App'x 21 (2d Cir. 2017) ......................................................... 17

*Dardana Ltd. v. Yuganskneftegaz*,
317 F.3d 202 (2d Cir. 2003) .............................................................. 20

*Davis v. Monroe County Bd. of Educ.*,
526 U.S. 629 (1999) .................................................................. passim

*Doe v. E. Haven Bd. of Educ.*,
200 F. App'x 46 (2d Cir. 2006) .............................................. 27, 29, 33

*Farmer v. Kansas State Univ.*,
918 F.3d 1094 (10th Cir. 2019) .................................................... 27, 31

*Farricielli v. Holbrook*,
215 F.3d 241 (2d Cir. 2000) .............................................................. 21

*Gant v. Wallingford Bd. of Educ.*,
195 F.3d 134 (2d Cir. 1999) .............................................................. 25

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) .......................................................................... 24

*Hayut v. State Univ. of N.Y.*,
352 F.3d 733 (2d Cir. 2003) .............................................. 24, 29, 32, 33

**Cases**                                                     **Page(s)**

*Henriquez v. Starwood Hotel Resorts Worldwide Inc.,*
549 F. App'x 37 (2d Cir. 2014) ............................................................ 21

*Jin v. Metro. Life Ins. Co.,*
310 F.3d 84 (2d Cir. 2002) ................................................................... 16

*Lively v. WAFRA Inv. Advisory Grp., Inc.,*
6 F.4th 293 (2d Cir. 2021)................................................................... 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
797 F.3d 160 (2d Cir. 2015) ............................................................... 17

*New York v. Mid Hudson Med. Grp., P.C.,*
877 F. Supp. 143 (S.D.N.Y. 1995) ...................................................... 11

*New York v. Utica City Sch. Dist.,*
177 F. Supp. 3d 739 (N.D.N.Y. 2016) .......................................... 11, 12

*People by Abrams v. 11 Cornwell Co.,*
695 F.2d 34 (2d Cir. 1982) ......................................................... passim

*Porat v. Lincoln Towers Cmty. Ass'n,*
464 F.3d 274 (2d Cir. 2006) ............................................................... 17

*Support Ministries for Persons with AIDS, Inc. v. Waterford,*
799 F. Supp. 272 (N.D.N.Y. 1992) ...................................................... 11

*Sykes v. Mel S. Harris & Assocs. LLC,*
780 F.3d 70 (2d Cir. 2015) ................................................................. 21

*Zappulla v. Annucci,*
636 F. App'x 824 (2d Cir. 2016) ......................................................... 21

**Rules**

Fed. R. Civ. Proc. 15 ...................................................................... 1, 16

iii

# PRELIMINARY STATEMENT

The district court's order granting judgment on the pleadings in favor of appellee Niagara-Wheatfield Central School District was erroneous. Contrary to the district court's conclusion, the State sufficiently alleged that it had standing to sue as *parens patriae* on behalf of current and future victims of sexual assault, harassment, and gender-based bullying in the district, as well as on behalf of all current and future students in the district and their families who fear for student safety as a result of the school district's deliberate indifference to ongoing acts of harassment, assault, and bullying. The district court further erred when it denied the State an opportunity to amend the complaint to cure any pleading deficiency despite Federal Rule of Civil Procedure 15(a)(2)'s instruction that leave to amend be freely given when justice so requires.

The school district offers no persuasive argument in defense of either of the district court's erroneous rulings. Instead, the school district's brief repeatedly makes the same error the district court made below by emphasizing the varying circumstances in which the four victims whose stories the State's complaint highlighted were initially assaulted, harassed, and bullied. Those variations are irrelevant. The

State's standing to sue as *parens patriae* comes from the school district's responses to those incidents, namely its ongoing practice of refusing to take any steps to protect victims of sexual and gender-based abuse from future harassment while at school. This practice has injured, and will continue to injure, a substantial segment of the population. Alternatively, the State was entitled to an opportunity to amend its pleadings to provide more detailed allegations regarding the consistency and pervasiveness of the school district's deliberate indifference to students who had been sexually assaulted, harassed, or bullied.

This Court should reject the school district's alternative argument in support of affirmance, which invites the Court to rule on the merits of the State's Title IX claim in the first instance on appeal. While the district court's ruling on the sufficiency of the complaint with respect to standing is plainly wrong and should be corrected on this appeal, as for the merits, this Court should follow its general practice of allowing the district court to first consider the substance of the State's claims.

# ARGUMENT

## POINT I

### THE STATE PLAUSIBLY ALLEGED STANDING TO SUE AS *PARENS PATRIAE* BECAUSE A SUBSTANTIAL SEGMENT OF THE POPULATION IS INJURED BY THE SCHOOL DISTRICT'S FAILURE TO PROTECT VICTIMS

The State adequately pled its standing to sue as *parens patriae* in the district court. The school district does not contest that the State demonstrated the first two elements of *parens patriae* standing: namely, a quasi-sovereign interest and the inability of individuals to obtain complete relief. *See People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 39-40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983); *see also* (Resp. Br. 10 (not disputing these elements)). And as the State previously demonstrated (Opening Br. 22-26), the State met the final requirement for *parens patriae* standing because it adequately alleged that the district's consistent pattern of refusing to protect victims of sexual assault, harassment, and gender-based bullying from ongoing harm despite complaints injures a substantial segment of the population.

Indeed, the State plausibly alleged that the school district's refusal to act harmed at least five groups of people that—considered together—represent a substantial segment of the population. Specifically, the State

alleged that the school district's practice of ignoring sexual and gender-based abuse harmed:

1.  the four victims described in detail in the State's complaint (Opening Br. 22, 24-25; JA 12-20);

2.  the other 30 individuals whose stories were not described in detail in the complaint but who the State alleged were similarly harmed when the school district likewise failed to take any steps to protect them from ongoing sexual harassment, assault, and gender-based bullying (Opening Br. 22, 25-26; JA 9-10);

3.  other current and future victims of sexual harassment, assault, and gender-based bullying within the school district whom the district will likewise fail to protect in the same manner that it has refused to act to protect victims since at least 2017 (Opening Br. 22-23; JA 15, 19);

4.  the district's entire student population, which feels unsafe in school and faces an increased risk of sexual harassment, assault, or gender-based bullying because of the school district's implicit message that such abuse will be tolerated without redress (Opening Br. 22-23; JA 10, 14-15, 19); and

5. parents of children in the school district, who fear that their children are unsafe at school, where they may be attending classes with students known to sexually harass, assault, or bully others (Opening Br. 23-24; JA 10, 14).

The school district is thus wrong in saying that the State's complaint alleged injury only to four students. (Response Br. 11.)

These allegations are more than sufficient to demonstrate *parens patriae* standing under this Court's decision in *11 Cornwell* and the Supreme Court's decision in *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592 (1982). These cases make clear that even when a relatively small segment of the population is directly affected by a challenged action, a legally cognizable "substantial segment" of the population may ultimately be affected. For instance, a substantial segment may be affected through the "indirect effects of the injury" done, including the "universal sting" of discrimination felt by all members of the particular group against whom the defendant discriminated. *See Snapp*, 458 U.S. at 607, 609; *11 Cornwell*, 695 F.2d at 39-40. A substantial segment may also be injured directly and indirectly in the future, even if a modest number of people are injured at the time the action is challenged. *See*

5

*11 Cornwell*, 695 F.2d at 39. These principles apply here, where the State has plausibly alleged that the school district's consistent policy of refusing to protect victims of sexual and gender-based abuse from subsequent acts of harassment and bullying have widespread effects on the entire student body and their families.

The school district counters that the State did not show a "discriminatory 'policy or practice'" by the district, which the district says is required for *parens patriae* standing, because the four illustrative examples used in the complaint are "four isolated and unrelated incidents." (Response Br. 11.) As an initial matter, the school district makes up this "policy or practice" requirement out of whole cloth. In *11 Cornwell*, this Court held that the State had standing to sue as *parens patriae* where neighbors all allegedly took different, unique steps as conspirators in furtherance of a single discriminatory act to deny housing to individuals with intellectual disabilities. *See* 695 F.2d at 37-38 (discussing process of denying housing). No single discriminatory policy or practice was alleged. Likewise here, even if the State had alleged that the school district took multiple different discriminatory actions that violated Title IX, such allegations would be sufficient to confer standing

to sue as *parens patriae* so long as the State could show that a substantial segment of the population was affected by the school district's discriminatory acts.

In any event, the State has plausibly alleged a consistent practice of inaction by the school district in the face of known, ongoing instances of sexual harassment, assault, and gender-based bullying between students. Contrary to the school district's assertion, the relevant question for determining if such a practice exists is not whether the specific facts of each incident of harassment, assault, or gender-based bullying were identical, but rather whether the school district's responses to those incidents constitute a consistent practice. The complaint plausibly alleged just that.[1]

---

[1] The school district's extensive detailing of the circumstances in which each illustrative victim was first assaulted or harassed (Response Br. 10-12, 16) is thus irrelevant. The State has never sought to hold the school district accountable for the off-campus rape of TG, the first instance in which students bullied CC for her style of dress, the initial TikTok that mocked AS, or the off-campus assault of LW. Rather, the State alleges that the school district's failure to protect these students from *further* harassment and abuse, after these initial incidents, resulted in ongoing harassment of each victim that caused serious injury. The relevant fact, then, is the school district's consistent practice of failing to take protective measures for previously victimized students and the
(*continued on the next page*)

Specifically, the complaint alleged that, as exemplified by the stories of TG, CC, AS, and LW and also experienced by at least 30 additional student victims, the school district had a consistent practice of failing to act to protect victims who reported sexual assault, harassment, or gender-based bullying. The school district consistently refused to create concrete safety plans or take any other meaningful action to ensure that students who had experienced sexual harassment, assault, or gender-based bullying by another student would not continue to be subjected to future acts of harassment, assault, or bullying by that same student while at school. (Opening Br. 24; JA 12, 14-18.) The school district responds that written safety plans are not required by Title IX. (Response Br. 12.) But the State alleged that the school district failed to take *any* preventative measures to ensure that victims would not face further harassment and bullying in school from the same perpetrator. Written safety plans are only one example of a step the school district

_____

subsequent injuries each victim experienced from the school district's deliberate indifference to ongoing abuse. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643-44 (1999) (discussing educational institutions' obligations under Title IX and common law to respond appropriately to the discriminatory acts of third parties).

could have taken but chose not to, thereby demonstrating deliberate indifference to the well-being of its students. And, regardless, the question of what actions the school district should have taken is a question on the merits of the State's Title IX claim. It is not relevant to the issue of standing.

Three other alleged practices of the school district are also relevant here. First, the district ignored repeated complaints by students or their parents of ongoing instances of harassment. (Opening Br. 24; JA 13-15, 17-18.) Second, the district actively harmed female students who reported harassment, including preventing or dissuading them from participating in school activities, refusing to allow them to transfer schools, and suspending students who showed support for them. (Opening Br. 25; JA 13, 15-17.) And third, the district consistently refused offers for educational programming and confidential advocacy from the Rape Crisis Program, even though every other school district in the county used those resources. (Opening Br. 25; JA 19.)

In short, the State plausibly alleged a consistent practice by the school district of ignoring the safety and comfort of its students by failing to meaningfully act, notwithstanding its notice that students were

victims of sexual or gender-based abuse by another student. Indeed, the district court recognized that the State had alleged such a "policy or practice of failing to respond to . . . instances of discrimination" (JA 135), but erroneously ignored the State's detailed allegations about why this practice injured and would continue to injure a substantial segment of the population.

The school district's remaining four arguments against standing similarly lack merit.

First, contrary to the school district's arguments (at 15-16), this case fully satisfies the criteria for *parens patriae* standing set forth in *11 Cornwell*. That case recognized that the indirect effects of discrimination against disabled individuals would have widespread effects, even if only eight to ten individuals were directly injured by the defendants' actions in that case. *See* 695 F.2d at 39. So too here, the State plausibly alleged that the school district's deliberate indifference to sexual and gender-based abuse has widespread effects on the entire student body and their families, as well as on future students who experience sexual and gender-based abuse in the district. (Opening Br. 22-24.) And the State plausibly alleged that, like the discrimination at issue in *11 Cornwell*, sexual

10

harassment and gender-based bullying involve the kinds of behavior that, if tolerated and left without redress, will embolden other would-be abusers to act, thereby causing "countless others [to] be affected." 695 F.2d at 39-40; *see also* (Opening Br. 21-23). These allegations are more than sufficient for *parens patriae* standing under *11 Cornwell*.

Second, the school district mistakenly contends that this case concerns harm to a smaller segment of the population than the harm at issue in several district court decisions upholding the State's *parens patriae* standing. (Response Br. 13-14 (citing *New York v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739 (N.D.N.Y. 2016); *Support Ministries for Persons with AIDS, Inc. v. Waterford*, 799 F. Supp. 272 (N.D.N.Y. 1992); and *New York v. Mid Hudson Med. Grp., P.C.*, 877 F. Supp. 143 (S.D.N.Y. 1995)). These decisions are entirely consistent with the conclusion that the State has standing to sue as *parens patriae* here.

For instance, in *Utica City School District*, the district court concluded that the State had plausibly alleged that a substantial segment of the population was injured by a policy that harmed only school children who had limited proficiency in the English language, which was about 25% of the school population and was expected to grow in the future.

177 F. Supp. 3d at 748. Here, the State has alleged an injury to the *entire* student body within the school district because all are placed at increased risk for sexual assault, harassment, or gender-based bullying by the school district's refusal to act. And regardless of whether any individual student becomes a victim of such abuse, all students face the fear that they will not be protected from such abuse while at school. (JA 10, 14-15, 19.) Indeed, even if the Court only looked at the increased risk and fear experienced by female students—who are at statistically higher risk of gender-based violence and bullying and have already voiced their concern that the district will not protect them (JA 10, 15)—female students constitute approximately half of the students in the school district, with new female students entering the school district every year. (JA 102 & n.4.)

The other district court decisions cited by the school district likewise concerned portions of the population similar in size to the number of current and future students allegedly affected by the school district's deliberate indifference here to ongoing sexual and gender-based abuse. And in any event, those cases merely held that the unique facts presented in each case satisfied the "substantial segment" criteria. None

12

of the cases purported to identify a minimum threshold for a "substantial segment" of the population, much less a minimum threshold that would exclude the facts of this case. Indeed, any such threshold would be inconsistent with the Supreme Court's instruction that courts not draw any "definitive limits" on the portion of the population that counts as substantial. *Snapp*, 458 U.S. at 607. These district court cases thus fail to support the school district's standing challenge.

Third, the school district attempts to fashion a new requirement for *parens patriae* standing, arguing that such standing is only proper when alleged discriminatory conduct is enforced against members of a group "as a matter of routine." (Response Br. 14, 16, 17.) But neither this Court nor the Supreme Court has ever suggested that *parens patriae* standing is predicated on how regularly a defendant's alleged injurious conduct occurs. To the contrary, in *11 Cornwell*, this Court held that the State had standing as *parens patriae* when only a single discriminatory action—preventing one sale of a single property to the State in order to provide housing to citizens with intellectual disabilities—was alleged. 695 F.2d at 37, 39. The school district's proposed test is thus foreclosed by existing precedent.

13

Moreover, the State's complaint satisfies this proposed requirement in any event. The State alleges that the school district has a consistent practice: in every or nearly every instance of sexual harassment, assault, or gender-based bullying that is reported to the school district or its officials, the school district refuses to act to protect victims from subsequent harassment and bullying. In other words, *as a matter of routine*, the school district refuses to take any action to protect victims when a victim reports sexual assault, harassment, or gender-based bullying to the school district and its officials.

Fourth, the school district argues (at 17-18) that the State's reference to at least 30 additional instances of sexual assault, harassment, and gender-based bullying in which the school district failed to take subsequent protective action (JA 10, 19) was insufficient to create standing. Initially, even if this Court discounted the complaint's reference to additional incidents, the stories of the four victims detailed in the complaint would themselves be sufficient to allege both a practice by the school district and that a sufficient segment of the population was injured and will continue to be injured by that practice. (Opening Br. 24-25.)

Moreover, the school district is wrong: the State's allegations about the district's deliberate indifference to 30 other substantiated reports of sexual harassment, assault, and gender-based bullying further support the State's standing to sue as *parens patriae*. (Opening Br. 25-26; JA 10, 12, 19.) Contrary to the school district's assertion, the complaint's allegations were neither vague nor conclusory. The State alleged that, like the four illustrative victims, the 30 incidents in question concerned sexual assault, harassment, or gender-based bullying and that the school district is in possession of evidence of these reports. (JA 10, 19.) And the complaint further alleged that, regarding these incidents, the school district did not create a single written safety plan or take any other follow-up action "to ensure the safety of any of these students." (JA 19; *see also* JA 10.) The complaint thus provided sufficient detail to survive judgment on the pleadings, particularly in a case in which many of the details of these incidents, as well as the identities of many of the victims (and perpetrators) involved were peculiarly within the possession and control of the defendant school district. *See, e.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). And although the school district appears (at 17) to suggest that the State should be required to meet some

15

heightened pleading standard by providing the details of every incident, this argument finds no support in this Court's precedents and is without merit.

The State plausibly alleged that a substantial segment of the population was injured, and will continue to be injured, by the school district's practice of ignoring reports of sexual assault, harassment, and gender-based bullying. The State thus has standing to sue as *parens patriae* to end that practice.

## POINT II

### THE STATE WAS ENTITLED TO LEAVE TO AMEND ITS COMPLAINT

Alternatively, and as the State previously demonstrated (Opening Br. at 27-30), the district court abused its discretion when it denied the State's request for leave to amend its complaint to cure its alleged pleading deficiency. Leave to amend is to be "freely given." Fed. R. Civ. Proc. 15(a)(2); *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002). A district court should thus deny leave to amend only when a good reason exists, such as "futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin*, 310 F.3d at 84. And a district court abuses its

discretion when, as here, it denies a plaintiff the opportunity to replead simultaneously with its decision that the complaint is defective because, in so doing, it deprives the plaintiff of a reasonable opportunity to seek leave to amend once it is on notice that its complaint is defective. *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015).

The school district does not argue that leave to amend would have been futile, unduly prejudicial, responsible for undue delay, or inappropriate based on any bad faith on the part of the State. Rather, the school district raises three arguments relating to the form of the State's request. (Response Br. 33-34.) None of these arguments has merit.

First, the school district mistakenly faults the State for not filing a formal motion for leave to amend. (Response Br. 33-34.) This Court has repeatedly stated "that where a plaintiff clearly has expressed a desire to amend, a lack of a formal motion is not a sufficient ground for a district court to dismiss without leave to amend." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006). That is exactly the case here.

17

Second, the school district suggests that the State should have requested leave to amend in its opposition to judgment on the pleadings rather than in its objections to the report and recommendation. (Response Br. 33.) The school district cites no support for this proposition, nor does it explain why it would have been meaningful to seek leave in one filing rather than the other. Although the State's request for leave to amend was made after the magistrate judge had issued its recommendation, it was made before the district court had ruled on the school district's motion for judgment on the pleadings, and the school district does not suggest that by placing its request in its objections to the magistrate judge's report and recommendation the State caused any harm to the school district or to the court.

Finally, the school district incorrectly accuses the State of failing to identify how amendment would address the supposed deficiency in the first amended complaint. (Response Br. 34.) The State made clear that it would plead further allegations detailing "the District's policy and practice of deliberate indifference" (JA 109), which would address the deficiencies the district court found in the complaint. (Opening Br. 28, 30.) Specifically, given the opportunity, the State would provide more

18

detailed allegations about the more than 30 additional cases in which the school district took no proactive measures to prevent further harassment and abuse toward students who had been victims of sexual assault, harassment, or gender-based bullying by classmates. (Opening Br. 28.) The State would also allege further facts about how the school district had continued its practice of ignoring ongoing injury to victims of sexual and gender-based abuse at school after the filing of the first amended complaint. (Opening Br. 28.) The State thus provided sufficient information to demonstrate how it could cure any deficiency in its pleading regarding the school district's consistent practice of deliberate indifference.

The district court's contrary conclusion was premised on a mistake of law and fact and was therefore an abuse of discretion. Namely, the district court seemingly relied on the same mistaken belief that caused it to grant judgment on the pleadings in the first place: that because the initial circumstances in which each victim was sexually assaulted, harassed, or bullied were unique, the school district's consistent policy of refusing to take any action afterward to protect the victim from subsequent bullying and harassment was somehow not actually a "practice."

The district court thus erred in concluding that additional examples further demonstrating the consistency and frequency of the school district's practice of deliberate indifference to all types of sexual assault, harassment, and gender-based bullying would be futile in demonstrating an unlawful practice by the school district.

## POINT III

### THIS COURT SHOULD NOT CONSIDER THE MERITS OF THE STATE'S CLAIMS IN THE FIRST INSTANCE

As an alternative basis for affirmance, the school district urges the Court to reach the merits of the State's underlying Title IX claims and rule that the complaint failed to state a cause of action—a ground not reached by the district court (JA 136). This Court should decline to resolve questions about the merits of this case in the first instance on appeal. If it nonetheless decides to consider the sufficiency of the State's claims, it should conclude that the school district is not entitled to judgment on the pleadings.

It is well settled that this Court does not ordinarily decide arguments in the first instance. *See, e.g.*, *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d Cir. 2003) ("It is this Court's usual practice to allow

20

the district court to address arguments in the first instance."); *accord Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97 (2d Cir. 2015); *Farricielli v. Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000). This Court thus routinely remands cases to the district court for consideration in the first instance rather than rule on alternative grounds for affirmance that the district court has not yet reached. *See, e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71-72 (2d Cir. 2012); *Henriquez v. Starwood Hotel Resorts Worldwide Inc.*, 549 F. App'x 37, 38 (2d Cir. 2014) (declining to assess the adequacy of complaint's pleadings under *Twombly* in the first instance); *Zappulla v. Annucci*, 636 F. App'x 824, 825 (2d Cir. 2016) (declining to affirm district court's order on other grounds and remanding to the district court to consider in the first instance). The Court should follow its ordinary practice in this case and remand for the district court to consider in the first instance whether the State has sufficiently alleged a claim under Title IX, taking into account any clarification of the law that this Court may provide in its opinion.

In any event, the State has plausibly alleged that the school district violated and continues to violate Title IX by consistently being deliberately indifferent to acts of student-on-student sexual harassment,

assault, and gender-based bullying. To establish that a school district violated Title IX in its handling of student-on-student sexual harassment, a plaintiff must show: (1) that officials had actual knowledge of the harassment, (2) that officials were deliberately indifferent to the harassment, and (3) that the harassment was so "severe, pervasive, and objectively offensive" that it deprived victims of access to educational opportunities or benefits provided by the school. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

The State's complaint plausibly alleged a systemic and ongoing Title IX violation caused by the school district's continuing practice of ignoring the risk of sexual assault, harassment, and bullying at its schools that deprives each and every student—and in particular female students and current and future victims of sexual assault, harassment, and gender-based bullying—of equal access to educational opportunities and benefits in the district. (*See* JA 9-10, 12, 19-20.) The State used the detailed stories of four victims to illustrate how the school's ongoing deliberate indifference to sexual and gender-based abuse harms individual students and violates Title IX.

The school district argues (at 20) that the State failed to allege that all three elements of a Title IX claim were met as to each of the four victims described in the complaint. But the State has plausibly alleged that all three criteria were met with respect to each of the four student victims provided in the complaint, as well as the 30 additional instances alleged in the complaint.

1. TG

Accepting the truth of the State's allegations, as necessary when evaluating a motion for judgment on the pleadings, *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021), the State sufficiently stated a violation of Title IX in the school district's deliberate indifference to ongoing sexual harassment and bullying against TG.

First, the State alleged that the school district had actual knowledge of harassment against TG. Before the start of her senior year of high school, TG's mother alerted then-principal Michael Mann that TG had been raped by another student at the school, showed text messages of the student admitting to the rape, and provided a copy of an order of protection for TG against the student. (JA 12.) Because the principal was an official "with authority to take corrective action" to protect TG from

23

further harassment by her abuser, the principal's knowledge of that situation conferred knowledge on the district. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see also Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750-51 (2d Cir. 2003). The district can thus be held liable for every act of harassment that TG faced during her senior year. *See Hayut*, 352 F.3d at 751 (school can be held liable for acts of harassment after official has been notified). TG also notified the school counselor during the second week of school that her rapist was going out of his way to interact with her, including standing outside of her classes and glaring at her. (JA 13.) The school district was thus on further notice of all subsequent harassment at school in which TG's rapist forced her to interact with him or went out of his way to intimidate her on school grounds. And TG notified Principal Mann after she received a first snapchat message from another student mocking TG for her rape, and again after she received text messages telling her that she enjoyed being raped. (JA 13.) The school district thus had knowledge that TG was at risk of ongoing bullying and harassment by other students about her rape.

Second, the State alleged that the school district acted with deliberate indifference toward the ongoing harassment and bullying of

TG. Deliberate indifference includes school actions that are "clearly unreasonable in light of the known circumstances," *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) (quoting *Davis*, 526 U.S. at 648, or become unreasonable because they are taken only after a "lengthy and unjustified delay," *Bruneau v. S. Korthright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009).

Here, the State alleged that the school district failed to take *any* meaningful action to protect TG from ongoing harassment by her rapist and other students over an entire school year. *See Davis*, 526 U.S. at 634-35, 653-54 (concluding that victim made out cognizable claim when school took "no disciplinary action" and made no effort to separate victim and abuser over a five-month period). The State alleged that the school principal took no action to prevent TG from having contact in school with her rapist even after assuring TG's mother that the two would be kept apart. (JA 12.) When TG reported forced interactions with her rapist, the school district took no actions to stop TG's rapist from purposefully standing outside her classrooms and glaring at her. (JA 13, 14.) Likewise, after TG reported harassing messages from other students to the

principal, the school took no action to discipline these other students or otherwise protect TG from ongoing harassment. (JA 13-14.)

And, to the extent the school district or its employees *ever* acted, it was to affirmatively harm TG or her supporters. The State alleged that the school's assistant principal told TG's family and other students and families that TG had faked a panic attack for attention. (JA 13.) The head coach of TG's cheerleading team prevented TG from attending certain games as punishment for missing practice to speak to the assistant district attorney prosecuting the ongoing rape case, allegedly telling TG "girls get assaulted all the time." (JA 13.) And when students planned a walkout to protest the school district's deliberate indifference toward TG, the school principal publicly confronted TG's mother, attempted to block students from participating, and later suspended several students who protested in support of TG. (JA 14-15.) Both the school district's inaction and affirmatively harmful actions were clearly unreasonable in light of the ongoing harassment of TG.

Finally, the State sufficiently alleged that TG suffered harassment so severe, pervasive, and offensive that it denied TG access to educational programs. Whether harassment is sufficiently severe, pervasive, and

offensive is highly fact-specific and "depends on a constellation of sur-
rounding circumstances, expectations and relationships." *Davis*, 526 U.S.
at 651 (citation omitted). A student's "fear of running into their student-
rapist[]," caused by a school's inaction after reports of a sexual assault, is
sufficient to constitute pervasive, severe, and offensive harassment.
*Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1105 (10th Cir. 2019); *see
also Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 48-49 (2d Cir. 2006)
(holding that a reasonable factfinder could conclude that harassment was
severe and pervasive where victim was crying and upset every day
because she saw her rapist at school and was called names).

The State has alleged exactly this kind of sexual harassment in the
present case, where TG had to see her rapist regularly at school, where
he would intentionally stand outside her classrooms and glare at her.
While the school district argues (at 21) that glaring is not itself sufficient
to constitute severe, pervasive harassment, the district ignores that this
individual had already sexually assaulted TG, and therefore his inten-
tionally intimidating gestures were traumatizing in a way an ordinary
student's glare would not have been. Likewise, the State alleged that
other students harassed TG for a significant period of time specifically

27

about her sexual assault, including suggestions that she enjoyed being assaulted, along with threatening physical violence against her, actions that are likewise severe and offensive. (JA 13-14.) Indeed, the State alleged that TG had a panic attack from these interactions, suffered from mental health deterioration, and started missing and skipping school to avoid harassment by both her rapist and other students. (JA 13-14.)

2. <u>CC</u>

The State likewise sufficiently alleged a Title IX claim against the school district with respect to its deliberate indifference to CC. On appeal, the school district does not contest that it had actual knowledge of the ongoing gender-based bullying against CC and acted with deliberate indifference to that bullying. Rather, it argues only that name-calling alone cannot constitute severe, pervasive, and offensive harassment. (Response Br. 24-25.)

The school district is mistaken. While it is true that the Supreme Court in *Davis* warned that the type of teasing and name-calling that students typically engage in will not give rise to a Title IX claim, *see* 526 U.S. at 652, this Court has repeatedly held that a consistent pattern of targeted name-calling can be sufficiently severe, pervasive, and

offensive to support a sex-discrimination claim. Thus in *Doe*, this Court concluded that a high school student subjected to daily name-calling for a period of five weeks, including "slut," "liar," "bitch," and "whore" could constitute sufficiently severe, pervasive, and offensive harassment to support a Title IX claim. 200 F. App'x at 48-49. And in *Hayut*, this Court concluded that a professor's semester-long references to a female adult student as "Monica" because she resembled Monica Lewinsky, along with weekly inquiries such as "how was your weekend with Bill?" and multiple references to a "cigar" were sufficiently pervasive and severe to create a hostile educational environment under the Fourteenth Amendment, which applies Title VII's hostile-environment standard. 352 F.3d at 744-48.

Here, the State has sufficiently alleged a prolonged period of targeted name-calling to support a Title IX claim. The State alleged that for a two-year period, CC was regularly called names and bullied for dressing in masculine clothes, repeatedly crying in the school counselor's office because of the harassment. (JA 15.) The State further alleged that after CC began dressing in a more feminine manner to avoid the constant abuse of her peers, she was harassed for another year, including being

criticized for her clothing, called "fat" and "ugly," and in one instance called a "slut" and told to kill herself. (JA 16.) This targeted, constant stream of abuse over three years caused CC to stop attending school and require psychiatric assistance due to anxiety and depression. (JA 16.) Altogether, these allegations were sufficient to plausibly allege a violation of Title IX.

3. <u>AS</u>

The State sufficiently alleged a Title IX claim against the school district for its deliberate indifference to AS. Specifically, the State plausibly alleged that the school district had actual knowledge that AS had been assaulted by several classmates yet failed to punish the assaulters, thereby making AS vulnerable to additional harassment and assault. The State alleged that after AS was harassed and physically assaulted at a school pep rally, AS's mother went to the acting principal of the school and reported what had happened. (JA 17.) The acting principal stated that he would not prevent AS's attackers from attending a school dance the next day and instead urged AS not to attend. (JA 17.) The school afterward took no punitive action against any of AS's assailants and did nothing to keep the assailants away from AS at school. (JA 17.) As a

30

result, the school district made AS vulnerable to ongoing sexual harassment and assault by her attackers. This increased vulnerability to harassment is itself sufficient to support a Title IX claim. *Davis*, 526 U.S. at 645; *Farmer*, 918 F.3d at 1103-05. And the State plausibly alleged that, because AS reasonably feared ongoing harassment and physical assault at school, she had to leave the school, thereby denying her educational opportunities. (JA 17.)

4. LW

The State sufficiently alleged a Title IX claim against the school district for its deliberate indifference to LW.

First, the State sufficiently alleged the school district's actual knowledge of harassment against LW. Specifically, the State alleged that after LW was assaulted off-campus by an older student, LW's mother reported the assault to LW's school principal and the district superintendent. (JA 18.) The school district thus had actual knowledge that LW was at risk of being further harassed or assaulted by that same student. When that student did harass LW at school, LW's mother reported this bullying to the school principal and attempted to report it to the school superintendent. (JA 18.) Other students then began joining in, repeating

31

the same sexual jeers that LW's assailant had used at school, including that LW was "damaged goods" and that LW had enjoyed being sexually assaulted. (JA 18.)

The school district argues that it did not have actual knowledge that other students would begin harassing LW in the same manner that LW's attacker harassed LW. (Response Br. 27-28.) This Court's decision in *Hayut* forecloses the district's argument. In *Hayut*, this Court concluded that an institution could be held liable for the "lingering, residual effects" of a professor's harassment—in particular, that other students had begun to mimic the professor's harassment by calling the plaintiff "Monica"—that occurred after the educational institution was given actual notice of the professor's harassment. 352 F.3d at 751. So too here: once the school district was on notice that a student had sexually assaulted LW and was mocking her about the assault at school, it was liable for the continued harassment LW suffered while at school, including harassment by other students who parroted the harassment and bullying originally said to LW by her abuser.

Second, the State sufficiently alleged that LW was subjected to severe, pervasive, and offensive acts that denied her educational oppor-

tunities. Specifically, LW's continued exposure to her sexual abuser, along with unwanted touching and taunts about the sexual abuse from the abuser and other students are sufficiently severe and offensive to support a Title IX claim. *Doe*, 200 F. App'x at 48-49 (reasoning that taunts about a recent sexual assault may be severe enough to support a Title IX claim). And the State alleged that this ongoing exposure to her assailant and frequent taunts caused LW to experience physical manifestations of stress and require counseling. (JA 18.) These allegations are sufficient to show that LW experienced a "disparately hostile educational environment relative to her peers," which a reasonable factfinder could conclude deprived LW of educational benefits and opportunities. *Hayut*, 352 F.3d at 750; *Doe*, 200 F. App'x at 48.

5. <u>Other Students</u>

Finally, the State sufficiently alleged that the school district has violated Title IX with respect to at least 30 other students. The State alleged that each of these 30 incidents involved sexual assault, harassment, or gender-based bullying, the documentation of which by the school district establishes the district's actual knowledge. (JA 10, 19.) The State further alleged that the school district acted with deliberate indifference,

declining to take *any* protective action to prevent further acts of harassment, assault, or bullying against those victims. (JA 10, 19.) And the State alleged that this deliberate indifference leaves students in the district more vulnerable to sexual assault, harassment, and gender-based bullying and has caused mental and emotional injuries that deprive students of equal access to education. (JA 9-10, 12, 19.) These allegations plausibly allege violations of Title IX sufficient to survive judgment on the pleadings.

# CONCLUSION

The decision of the district court should be reversed and this case remanded.

Dated:  Albany, New York
        May 23, 2023

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Plaintiff-Appellant

By:  _/s/ Alexandria Twinem_____
     Alexandria Twinem
     Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
      *of Counsel*

The Capitol
Albany, New York 12224
(518) 776-2042

35

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alexandria Twinem, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,774 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Alexandria Twinem*