UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2023

(Argued: October 27, 2023      Decided: October 15, 2024)

Docket No. 22-2178-cv

─────────────────────────────

PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK,
*Plaintiff-Appellant,*

v.

NIAGARA-WHEATFIELD CENTRAL SCHOOL DISTRICT,
*Defendant-Appellee.*

─────────────────────────────

Before:      CABRANES, SACK, AND MERRIAM, *Circuit Judges.*

On this appeal, we address the issue of what a state bringing suit in federal court must show to establish its standing *in parens patriae*. The State of New York, through its Attorney General, sued the Niagara-Wheatfield Central School District for its officials' alleged failure to address repeated complaints of student-on-student sexual assault, sexual harassment, and gender-based violence and bullying. The United States District Court for the Western District of New York (Sinatra, Jr., *Judge*) dismissed this case on the pleadings, concluding that the state lacked *parens patriae* standing to bring the suit. The court reasoned that because the incidents alleged were factually distinct from one another, the State of New York had not shown that the School District's failure to act in those instances constituted a broader "policy or practice" of discriminating against student victims of gender-based violence and harassment. Absent such a policy or practice, the court concluded, the State of New York could not, as a matter of law, make the showing required for *parens patriae* standing that the School District's conduct affected a "substantial segment" of its population.

We conclude that showing an injurious policy or practice enforced against a target population is not necessary to satisfy the substantial-segment prong of the *parens patriae* standard. We further conclude that the State of New York has met its burden of pleading *parens patriae* standing at this stage of the litigation, and therefore

REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

Judge Cabranes concurs *dubitante* in a separate opinion.

> ALEXANDRIA TWINEM (Barbara D. Underwood, Andrea Oser, *on the brief*), for LETITIA JAMES, Attorney General for the State of New York, Albany, NY, *for Appellant*.
>
> DANIEL R. LECOURS (Svetlana K. Ivy, *on the brief*), Harris Beach PLLC, Albany, NY, and Pittsford, NY, *for Appellee*.

SACK, *Circuit Judge*:

This appeal requires us to identify what a state bringing a lawsuit in a federal court must show to establish so-called *"parens patriae"* standing. When a state sues *in parens patriae*, "literally[,] [as] 'parent of the country'", it "traditionally [takes on] the role of . . . sovereign and guardian of persons under a legal disability to act for themselves." *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1089 (2d Cir. 1971). The "doctrine has its antecedent in the common-law concept of the 'royal prerogative,'" which similarly recognized "the king's

inherent power to act as the guardian" for those without the legal capacity to vindicate their rights. *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013) (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257 (1972)). In modern *parens patriae* suits, a state "must articulate a 'quasi-sovereign interest' distinct 'from the interests of particular private parties,' such as an 'interest in the health and well-being—both physical and economic—of its residents in general.'" *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)).

Here, the State of New York, through its Office of the Attorney General ("OAG"), brought suit against the Niagara-Wheatfield Central School District (the "School District"). The OAG alleged in its amended complaint (the "Complaint") that School District officials had failed to address repeated complaints of student-on-student sexual assault, sexual harassment, and gender-based violence and bullying.

The United States District Court for the Western District of New York (Sinatra, Jr., *Judge*) dismissed the Complaint, concluding that it failed to plausibly plead that the state had *parens patriae* standing. The court reasoned that, because the OAG had based its claim on factually distinct incidents, it had not successfully asserted that the School District engaged in a broader policy or

practice of failing to protect student victims of gender-based violence and

harassment.  Absent such a policy or practice, it decided, the OAG could not

make the showing required for *parens patriae* standing that the School District's

conduct affected a "substantial segment" of New York State's population.

We conclude that showing an injurious policy or practice enforced against

a target population is not necessary to satisfy the substantial-segment prong of

the *parens patriae* standard.  We further conclude that the OAG has met its

burden of plausibly alleging *parens patriae* standing at this stage of the litigation,

and therefore reverse the judgment of the district court and remand for further

proceedings consistent with this opinion.

## BACKGROUND

### I.    Factual Allegations

The OAG's allegations in this litigation fall into three categories:  First are

detailed assertions of how four of the School District's students were subjected to

sexual assault, sexual harassment, or gender-based violence and bullying by

other students; how the four student victims and their parents repeatedly

notified the School District and requested remedial action; and how the School

District consistently failed to respond adequately.  Second is the allegation that

the School District knew of, but ignored, at least thirty similar incidents. And

third are allegations that the School District's lapses affected not only the student

victims, but the School District's community as a whole. "In reviewing [the

School District]'s motion for judgment on the pleadings, we draw all facts—

which we assume to be true unless contradicted by more specific allegations or

documentary evidence—from the Complaint . . . ." *Kirkendall v. Halliburton, Inc.*,

707 F.3d 173, 175 n.1 (2d Cir. 2013) (internal quotation marks and citation

omitted). It bears emphasis that what follows—which many might well find

disturbing—are allegations only. But at this stage of the proceedings, a court is

concerned with whether allegations are plausible, not whether those allegations

have been established as facts.

A.   The School District's Alleged Failure to Respond to Four Individual
     Students' Complaints of Sexual Assault, Sexual Harassment, and Gender-
     Based Violence and Bullying

   ***T.G.'s rape and subsequent bullying***.  In May 2018, the OAG alleges, T.G., a

female rising senior at Niagara Wheatfield Senior High School (the "High

School"), was raped by E.D., a male rising senior at the High School, in E.D.'s

home. T.G. reported the incident to the police, after which E.D. was arrested and

charged.  Soon thereafter, T.G. obtained a restraining order prohibiting E.D. from coming near T.G. outside of the High School.

In an attempt to ensure T.G.'s safety during the upcoming 2018–19 school year, T.G.'s mother met with the High School's then-Principal Michael Mann before the school year began.  T.G.'s mother showed Mann the restraining order, as well as text messages from E.D. to T.G. in which E.D. apologized for what he had done to her.  Mann promised the mother that T.G. and E.D. would not have contact with one another during the school year, but declined to offer a concrete safety plan or to punish E.D., because the criminal charges had not, at least at that time, been resolved against him.

The Complaint further alleges that in the fall of that year, E.D. "went out of his way" to "frequently stand outside [of T.G.'s] classroom," "wait for her to walk out," and "glare at her."  Am. Compl. ¶ 22.  Encounters of this kind happened multiple times every week even though T.G.'s and E.D.'s lockers were not near one another.  During the second week of the school year, T.G. notified the school counselor of those incidents.  The school took no action.  T.G. suffered a panic attack thereafter.

At an "open house," the High School's Assistant Principal, Jeff White, approached T.G.'s family and stated, in front of other students and parents, that in White's view, "TG had faked the panic attack for attention." *Id.* ¶ 24. T.G., a school cheerleader, began to absent herself from cheerleading practice. T.G.'s cheerleading coach refused to excuse her absences, allegedly stating that "girls get assaulted all the time." *Id.* ¶ 25.

In December 2018, other students began to harass T.G. about the rape she had reported. One classmate sent T.G. a picture of E.D. over Snapchat, with the caption "your boyfriend." *Id.* ¶ 26. T.G. showed the message to Principal Mann, who took no action. Other classmates sent T.G. text messages insinuating that she had enjoyed the sexual assault by E.D. T.G. showed the messages to the assistant principal, who took no action. When classmates told T.G. to "watch her back," T.G.'s mother informed the School District's superintendent, but received no response. *Id.* ¶ 28. None of the students involved in the alleged offending behavior was disciplined, and the school continued to permit E.D. to attend class in a room across from T.G.'s classroom. In January 2019, E.D. continued to stare repeatedly at T.G. in the hallway. T.G. began to miss classes because of these events.

On May 23, 2019, E.D. pleaded guilty to the assault on T.G., which was charged as rape in the third degree.  T.G.'s mother informed the school about the conviction, but was told by Principal Mann that, on the advice of counsel, E.D. would be permitted to attend prom, graduation, and all other end-of-year school functions.

Later in May, T.G.'s mother posted on a social media platform an account of how the School District had failed to address her requests to shield her daughter from E.D.  By the following morning, T.G.'s mother had received "a hundred messages from other parents in the District, expressing concern that a rapist was in school with their children all year long."  *Id.* ¶ 36.  On May 31, 2019, students at the High School organized and attended a walkout in protest over the High School's handling of the incident.  Principal Mann discouraged the walkout.  Staff at the High School blocked doorways in an attempt to prevent more students from walking out; several students were suspended because of their participation in the event.  A video recording shows Principal Mann telling student protestors that the walkout was not "civil," even though no violence or unrest had occurred.  *Id.* ¶ 39.  A female student responded asking whether

"[a]llowing all of us girls to be in danger is civil?" *Id.* The walkout garnered

national media attention. E.D. was later expelled.

    ***C.C.'s gender-based bullying***.  C.C., a female student, was bullied because

of the clothing she wore while a student at Edward Town Middle School and the

High School.  Throughout middle school, C.C.'s peers called her "gay" and

"transgender" because she wore stereotypically male outfits.  Am. Compl. ¶ 43.

C.C. notified her school counselor, Dr. Peters, who initially permitted her to

work in his office but eventually told her to return to the classroom.  The

bullying continued.

    As a High School student, C.C. began to wear more stereotypically

feminine clothing in an attempt to avoid further harassment.  However, C.C.'s

peers then called her "fat," "ugly," a "slut," and in one case told her to kill

herself.  *Id.* ¶¶ 45–46.  Throughout the ninth grade, C.C. and her family

repeatedly informed Dr. Peters of this harassment, but neither he nor any

administrator in the School District took action to prevent its further occurrence.

    In December 2019, after the onset of anxiety and depression, and having

seen a counselor and a psychiatrist, C.C. stopped attending the High School.

When C.C. requested a transfer to a neighboring high school, the School District

refused.  Instead, it called Child Protective Services, New York State's agency

tasked with protecting the well-being of children, because C.C. was missing

classes.  As a result of her harassment and bullying, unmitigated by any

protective action by the School District, C.C. dropped out of the High School.  At

the time the Complaint was filed in federal district court in August 2021, C.C.

had not received a high school diploma.

> ***A.S.'s gender-based harassment and physical assault***.  A.S., a female

student, attended the High School in the spring of 2020.  Around that time, a

male football player at the High School created a TikTok video displaying other

football players' messages mocking A.S.  The video included comments by one

boy that A.S.'s sweatpants made it look like she had male genitalia, and by

another boy that he would not have sex with A.S.  The video was shared among

the school's student body.

Shortly thereafter, female friends of the football players began harassing

A.S.  A school pep rally turned into a violent physical assault of A.S.  Members of

the sophomore class engaged in derogatory chanting about A.S. and five

sophomore girls displayed a poster about A.S. reading "We don't want you."

Am. Compl. ¶ 54.  The five girls then assaulted A.S., hitting her in the head

eleven times. A.S.'s mother went to the principal's office and described the

incident to Acting Principal Jeff White. The High School did not take any action.

Instead, White suggested to A.S.'s mother that A.S. should not attend the

following day's school dance.

A.S.'s mother repeatedly followed up with both the High School and the

School District's superintendent seeking protective steps for her daughter. She

received no response, and nothing was done. Because A.S. had become afraid of

attending the High School, she eventually transferred to a private school.

**L.W.'s *sexual assault and subsequent sexual harassment and bullying*.**

L.W., a female student, attended second grade at Errick Road Elementary School

(the "Elementary School") in 2017. That year, L.W. was sexually assaulted in her

housing complex by a neighbor, a fifth grader at the Elementary School. L.W.'s

mother reported the sexual assault to local law enforcement officials, Elementary

School principal Nora O'Bryan, and School District Superintendent Daniel

Ljiljanich. A court placed the assailant on probation and ordered the assailant's

family to move out of L.W.'s housing complex. However, the School District

took no action against the assailant, or to shield L.W. from the assailant at school.

Instead, Superintendent Ljiljanich informed L.W.'s mother that, if she wished

L.W. to be safe from her assailant, *she* would have to move to another area so L.W. could attend a different school.

According to the allegations, L.W.'s assailant continued to attend L.W.'s school and would eat lunch in a space near L.W. every day. When passing L.W., the assailant would touch L.W.'s arm and tell her that she was "damaged goods" and that "no one [would] ever love [her]." Am. Compl. ¶ 64. On another occasion, the assailant followed L.W. into a school bathroom. Superintendent Ljiljanich did not return L.W.'s mother's repeated calls, and Principal O'Bryan did nothing to protect L.W., despite L.W.'s mother's expressed concerns.

L.W.'s assailant eventually moved out of the School District. Even then, however, other students at the Elementary School now allegedly called L.W. "damaged goods," based on what the assailant had said about L.W. *Id.* ¶ 67. They also told L.W. that she had enjoyed what her assailant had done to her. The sexual assault and the continued bullying thereafter caused L.W. to develop physical manifestations of stress and required her to seek personal counseling for two years.

B.     The School District's Failure to Respond to Known Similar Incidents

The OAG further alleges in its Complaint that the School District was notified of "at least thirty incidents of sexual assault, harassment, or gender-based bullying in the last few years." Am. Compl. ¶ 69; *see also id.* ¶ 5 (similar).[1] The School District has taken no action in response to any of them, be it by "creat[ing] a single written safety plan," "document[ing] any follow-up to ensure the safety of any of these students," taking other "basic steps to prevent or respond to future sexual assaults," or "tak[ing] any steps to develop preventative policies or reform its practices." *Id.* ¶¶ 69–70, 72; *see also id.* ¶¶ 4–5 (similar). Moreover, the School District ignored repeated offers by the Rape Crisis Program of the Young Women's Christian Association for the Niagara Frontier ("YWCA") to provide educational programming on domestic and dating violence— programming the organization provides to every other school district in Niagara County. In sum, according to the allegations, the School District refused to act in the face of known and frequent complaints of sexual assault, harassment, or

---

[1] It is not clear from the face of the Complaint whether these thirty or more incidents include the four detailed incidents recounted above. *See* Am. Compl. ¶ 69 ("The District has been notified of at least thirty incidents of sexual assault, harassment, or gender-based bullying in the last few years.").

gender-based bullying—whether through general policies aimed at prevention,

individually tailored remedial actions, or any other means.

C.     Broader Effects on the Student Body and School Community

The School District's consistent refusal to act allegedly led to several

broader effects, impacting many more than the four student victims.  First, the

Complaint alleges that the four student victims' harassment and bullying was

perpetrated by whole *groups* of students, not merely individuals.  *See* Am.

Compl. ¶¶ 26–28, 30 (describing T.G.'s harassment by multiple students because

of E.D. having reportedly raped her), *id.* ¶¶ 43–46 (describing C.C. repeatedly

being bullied, evidently by more than one student), *id.* ¶¶ 52–55 (describing A.S.

being mocked by members of the football team and her being bullied and

assaulted by the players' friends), *id.* ¶ 67 (describing L.W. being bullied by

"other students . . . based on what [L.W.'s] assailant told them about [her]").

Thus, the incidents affecting these four victims are alleged to have *directly*

involved dozens of students.

Second, the Complaint alleges that the School District's failure to address

these behaviors "indicates to all students" that the School District will not protect

*them* from sexual assault, harassment, or gender-based bullying.  *Id.* ¶ 72.

According to the Complaint, this "indifference . . . impacts the student body and the school community as a whole" by signaling to all of its members that School District personnel will not act to ensure student safety. *Id.* ¶ 5. This manifested in the School District's repeated refusal to accept educational programming on domestic and dating violence designed to benefit the entire School District community, *id.* ¶ 71, and in the occurrence of at least "thirty documented incidents of sex discrimination, sexual harassment, sexual assault, and gender-based bullying at [the School District]," *id.* ¶ 5. In T.G.'s case, parents and students explicitly voiced their concern that the School District's inaction was leaving them unprotected. *See id.* ¶ 36 (alleging that T.G.'s mother had received "a hundred messages from other parents in the District, expressing concern that a rapist was in school with their children all year long"); *id.* ¶ 39 (alleging that a High School student confronted Principal Mann for "[a]llowing all of us girls to be in danger"). These failures by the School District are alleged to give students and their parents "a reasonable basis to believe [the students] are, in fact, in danger." *Id.* ¶ 72.

## II.    Procedural Background

On June 23, 2021, the OAG filed the original complaint in the United States

District Court for the Western District of New York.  On August 24, 2021, before

any responsive pleadings had been filed, the OAG filed the (presently operative)

Complaint, bringing a Title IX claim and a state law claim for negligent

supervision against the School District.  The School District answered, and on

March 10, 2022, moved for a judgment of dismissal on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c).[2]

On May 11, 2022, United States Magistrate Judge for the Western District

of New York Leslie G. Foschio issued a Report and Recommendation ("R&R"),

recommending that the district court dismiss the OAG's Title IX claims for lack

of *parens patriae* standing and decline to exercise supplemental jurisdiction over

the state-law claim of negligent supervision.  However, if the district court were

to determine, contrary to the recommendation, that the OAG had established

standing *in parens patriae* to bring its Title IX claim, the R&R recommended that

the court hold that the OAG had plausibly pleaded a Title IX claim, exercise

---

[2] Federal Rule of Civil Procedure 12(c) provides:  "After the pleadings are closed—but early enough not to delay a trial—a party may move for judgment on the pleadings."

supplemental jurisdiction over the negligent-supervision claim, and permit both

to proceed to discovery.

On August 26, 2022, the district judge, over the OAG's objection, adopted

the R&R's reasoning that the OAG lacked *parens patriae* standing.  The district

judge agreed with the R&R that the OAG had alleged four factually distinct

incidents that did not reveal a generalized discriminatory "policy or practice" of

failing to protect victims of gender-based assault, harassment, and bullying in

the School District.  Without such a policy or practice, the district court

continued, the OAG could not make the required showing for *parens patriae*

standing that the School District's conduct had affected a substantial segment of

the state's population.  The district court dismissed the Title IX claim on that

basis, declined to exercise supplemental jurisdiction over the state-law claim of

negligent supervision, denied the OAG's request for leave to replead (raised for

the first time in objection to the R&R) as untimely and futile, and dismissed the

case with prejudice.

On September 26, 2022, the OAG timely appealed to this Court, arguing

that the district court had committed three reversible errors.  First, the

substantial-segment prong of the *parens patriae* standing test does not require a

showing that the defendant engaged in an injurious policy or practice.  Second,

and in any event, the OAG had shown a consistent practice by the School District

of repeatedly refusing to protect students subjected to gender-based assault,

harassment, and bullying.  Third, the district court abused its discretion in

denying the OAG's request for leave to amend its Complaint.  For the reasons

that follow, we agree with the OAG on the first issue, reverse on that basis, and

therefore do not reach the second and third issues.

## STANDARD OF REVIEW

We review a district court's determination of standing *de novo*.  *Maddox v.

Bank of N.Y. Mellon Tr. Co.*, 19 F.4th 58, 62 (2d Cir. 2021).  Where, as here,

"standing is challenged on the basis of the pleadings, we accept as true all

material allegations of the complaint, and must construe the complaint in favor

of the complaining party."  *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 283

(2d Cir. 2023).  Nonetheless, at the pleading stage, "the plaintiff must 'clearly . . .

allege facts demonstrating' each element" of standing.  *Spokeo, Inc. v. Robins*, 578

U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  A denial of

leave to amend the complaint is reviewed "for abuse of discretion, unless the

denial was based on an interpretation of law, such as futility, in which case we

review the legal conclusion *de novo*." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

## DISCUSSION

### I.  *Parens Patriae* Standing

A.  <u>Legal Framework</u>

"[T]he doctrine of standing . . . requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction." *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 58 (2d Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *see also Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 156 (2d Cir. 2003) ("[B]ecause standing is jurisdictional under Article III, it is a threshold issue." (alterations adopted and citation omitted)).

A state seeking to protect "a 'quasi-sovereign interest' distinct 'from the interests of particular private parties,' such as an 'interest in the health and well-being . . . of its residents in general,'" may file suit in federal court *in parens patriae*.  *Purdue Pharma*, 704 F.3d at 215 (quoting *Snapp*, 458 U.S. at 607); *see also Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000).  A state suing *in parens patriae*

19

must establish "(1) [an] injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief." *New York v. Griepp*, 991 F.3d 81, 131 (2d Cir.), *vacated on other grounds on rehearing*, 11 F.4th 174 (2d Cir. 2021).

We conclude, and the School District does not dispute, that the OAG has adequately alleged that it is seeking to vindicate a quasi-sovereign interest—"the health and welfare," *Snapp*, 458 U.S. at 607, of students exposed to gender-based violence and harassment whether as victims, perpetrators, or bystanders, and their families—and that the individuals on whose behalf it is bringing suit cannot obtain complete relief.[3] *See* Appellant's Br. at 15 *and* Appellee's Br. at 10–15 (asserting failure to allege harm to a substantial segment of the state's population as the only basis for the defendant's assertion that *parens patriae* standing is lacking). The only issue for us to decide with respect to standing, then, is whether the OAG's allegations would, if proved, establish that the School District's conduct affected a sufficiently substantial segment of New York State's population. For the reasons set forth below, we conclude that they would.

---

[3] Students, of course, pass through individual schools in just a few years, making it particularly likely that without State intervention, the School District community would be unable to obtain meaningful relief.

B.     Analysis

*1.     The substantial-segment standard as established by* 11 Cornwell Co.

To satisfy a court that a sufficiently substantial segment of the state's population was injured, a state must establish (1) an "injury to an identifiable group of individual[s]," and (2) "indirect effects of the injury" ranging beyond that identifiable group.  *Snapp*, 458 U.S. at 607; *see also People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 38–39 (2d Cir. 1982) (materially same), *vacated in part on other grounds on rehearing*, 718 F.2d 22 (2d Cir. 1983).  There are no "definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior."  *Snapp*, 458 U.S. at 607; *see also New York v. Peter & John's Pump House, Inc.*, 914 F. Supp. 809, 812 (N.D.N.Y. 1996) ("There is no numerical talisman to establish *parens patriae* standing." (Pooler, *District Judge*)).

The district court, in adopting the R&R, added its own gloss to the substantial-segment standard.  Based on its review of *11 Cornwell Co.* and district court caselaw in this Circuit, the court concluded that a state suing *in parens patriae* must establish a "discriminatory conduct, policy, or practice" that is "as a matter of routine, . . . enforced against a member of the [targeted population]."  Joint App'x at 123; *see also id.* at 66 (R&R articulating the standard).  According to

21

the adopted R&R, the OAG attempted to allege that the School District had a

policy or practice of ignoring student "complain[t]s about gender-based

harassment and sexual assault." *Id.* at 67. But the inference that the School

District had such a policy or practice was implausible, the R&R continued,

because the OAG sought to base that inference on the victimization of four

students whose cases were factually distinct from one another with no indication

of broader trends or effects. Because "more must be alleged than injury to an

identifiable group of individual [students]," *id.* at 67 (quoting *Snapp*, 458 U.S. at

607), the R&R recommended dismissal for lack of *parens patriae* standing. The

district judge adopted the recommendation and its underlying reasoning. *See id.*

135–36.

   We disagree. The controlling authority in this Circuit—*11 Cornwell Co.*—

nowhere states or even suggests that a defendant's challenged conduct must

amount to a policy or practice enforced against a target population to satisfy the

substantial-segment prong of the *parens patriae* test. In that case, a state agency

had intended to purchase a piece of real estate and transform it into an assisted-

living facility for eight to ten mentally disabled adults. To thwart the project, a

group of neighbors conspired to purchase the property and refuse to sell it to the

state. *See* 695 F.2d at 37–38. The state sued *in parens patriae*; the defendants

moved to dismiss. The district court denied the motion, holding that the

"representation of mentally disabled persons is the paradigm case for *parens*

*patriae* standing." *New York v. 11 Cornwell Co.*, 508 F. Supp. 273, 277 (E.D.N.Y.

1981). On appeal, we concluded that the state had pleaded sufficient facts to

establish *parens patriae* standing. The state had pleaded—and we treated as true

for the purpose of reviewing an appeal from a motion to dismiss—that a

substantial segment of the population had been affected by the *single*

discriminatory act of refusing to sell the property at issue to the state. *See* 695

F.2d at 38–39. That alleged act alone affected at least five different populations,

either directly or indirectly. First, refusing to sell the property to the state

prevented "eight to ten moderately [disabled] adults plus two 24-hour

'houseparents'" from living at the intended home. *Id.* at 39. Second, "any

number of [disabled] persons" would have been prevented from "receiv[ing]

rehabilitation" in the future. *Id.* Third, the alleged discriminatory act would

have burdened the state with "the cost of keeping more people in institutions."

*Id.* Fourth, all disabled individuals then living in state institutions would have

been forced "to live in more crowded surroundings." *Id.* Finally, "[b]oth [the

disabled] persons and community residents"—including the alleged

discriminators—would have been "deprived of being able to live in integrated

communities." *Id.*; *see also Snapp*, 458 U.S. at 609 (recognizing "the political,

social, and moral damage of discrimination" on a substantial segment of the state

even though the *tangible* effects of a discriminatory act are limited). None of

these variegated effects—economic and social, direct and indirect—on different

populations flowed from an alleged policy, practice, or any routine or repeated

conduct. A single act sufficed to establish *parens patriae* standing.

Under the law of this Circuit, then, a state seeking to bring suit *in parens*

*patriae* need not plead, nor later prove, a policy or practice, or any repeat conduct

routinely aimed at a single target population. A single challenged act by the

defendant may satisfy the substantial-segment prong, so long as that action

meets *Snapp*'s requirements of showing sufficient "injury to an identifiable group

of individual[s]" and "indirect effects of the injury" beyond that group. *Snapp*,

458 U.S. at 607.[4] These indirect effects can vary and need not all fall on the same

---

[4] Of course, establishing a discriminatory policy or practice *may* be one way to satisfy the substantial-segment prong of *parens patriae* standing. Today, we conclude only that establishing such a policy is not required. The district court cases discussed in the R&R and the district judge's adoption of the R&R do not suggest otherwise. Two of the cited cases never mention a policy or practice and concluded that the substantial-segment prong was satisfied based on no more than several isolated acts. *See Support Ministries for Persons with AIDS, Inc. v. Vill. of*

group.  In determining whether those effects "give the State standing to sue as

*parens patriae*," courts may consider "whether the injury is one that the State, if it

could, would likely attempt to address through its sovereign lawmaking

powers," *Snapp*, 458 U.S. at 607, and whether the injury "carr[ies] a universal

sting," *id.* at 609.

---

*Waterford*, 799 F. Supp. 272, 275–77 (N.D.N.Y. 1992) (holding that a zoning appeals board's single denial of a permit to create a residence for homeless persons with AIDS immediately affected fifteen would-be residents, "similar [persons with AIDS] in months and years to come, as well as the members of the community itself, including the very neighbors who rallied against the Support Ministries' project," and the state's economy); *New York v. Mid Hudson Med. Grp.*, 877 F. Supp. 143, 145, 148 (S.D.N.Y. 1995) (concluding that a hospital's denial of interpretive services to a single deaf patient affected substantial segment of the population because "[t]he effects of Mid Hudson [Hospital]'s alleged discrimination" extended to all of "its seven to ten deaf patients" and indeed "threaten[ed] all hearing impaired citizens and perhaps disabled citizens throughout New York").  In two other cases, the plaintiffs alleged a policy or practice.  *See New York v. Peter & John's Pump House, Inc.*, 914 F. Supp. 809, 811 (N.D.N.Y. 1996) (alleging "a practice and policy of refusing admission [to a night club] to African Americans because of their race or color"); *New York v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 744 (N.D.N.Y. 2016) (alleging a "policy and practice" of "mandatory 'English as a second language' . . . program for immigrant students aged 17–20" seeking to enroll at Proctor High School, "regardless of whether or not the student expressed a wish to attend 'regular' high school"). But neither district court decision suggested that such a pleading was *necessary* to survive a motion to dismiss.  Finally, we are unpersuaded by *New York v. Holiday Inns, Inc.*, 656 F. Supp. 675 (W.D.N.Y. 1984), in which the plaintiffs alleged only a past practice of laying off older workers to replace them with younger ones, and the district court dismissed the case because the pleadings did not give rise to a plausible inference that the practice would continue to be applied to older workers in the future.  *See id.* at 676–77.  *Holiday Inns* provided no reasoning to support its conclusion.

And of course, we take no position on what is required by the other prongs of *parens patriae* standing—asserting a quasi-sovereign interest and an inability for individual plaintiffs to obtain complete relief.

2.     *The OAG's allegations satisfy the substantial-segment prong of* parens patriae *standing.*

We further conclude that the New York Attorney General has pleaded

sufficient facts to satisfy the substantial-segment prong of *parens patriae* standing

here.  As with the alleged discriminatory act in *11 Cornwell Co.*, the School

District's conduct as alleged here would have had direct and indirect harmful

effects on different groups which, in combination, constitute a substantial

segment of New York's population.

First among those groups are the four students allegedly subjected to their

peers' sexual assault and harassment, gender-based violence, and bullying—"an

identifiable group of individual[s]" injured by the School District's alleged

inaction.  *Snapp*, 458 U.S. at 607.  The School District's failure to respond to the

students' complaints may very well have left them with the knowledge that they

would not be protected by the School District, which led to such tangible effects

as a panic attack (T.G., Am. Compl. ¶ 23), years of counseling (L.W., Am. Compl.

¶ 68), missing school or practice (T.G., Am. Compl. ¶¶ 29, 31; C.C., Am. Compl.

¶ 50), transferring to a private school (A.S., Am. Compl. ¶ 59), and dropping out

of school altogether (C.C., Am. Compl. ¶ 51).  *Cf. 11 Cornwell Co.*, 695 F.2d at 39

(discussing the direct effect felt by the eight to ten disabled individuals and their caretakers from the residents' alleged discriminatory act).

Second, and also directly affected, are dozens of other students whose similar complaints were also ignored by the School District. The School District protests that this allegation is conclusory, but we are not persuaded. We are not here deciding the merits, *i.e.* whether the OAG has plausibly alleged a Title IX or negligent-supervision claim. Rather, we are determining whether the OAG has met its pleading burden to plausibly allege the basis for the substantial-segment prong of *parens patriae* standing. In this context, "[t]he Attorney General's use of a small group of 'aggrieved persons' as exemplars for a larger class is neither new nor objectionable." *New York v. Mid Hudson Med. Grp.*, 877 F. Supp. 143, 147 (S.D.N.Y. 1995).

As alleged by the OAG, the indirect effects of the alleged injury, too, were widely felt. First, they were felt by the parents of the four students who were left with the understanding that the School District would not protect their children and therefore were required to contend with the psychological and financial burdens of dealing with the effects the School District's inaction had on their children. Second, and as alleged, there are victims of "future harassment," Am.

Compl. ¶ 3, and "future sexual assaults," *id.* ¶ 70. This prospective group, too, will not be protected by the School District if it continues to act as the Complaint alleges it has historically done. *Cf. 11 Cornwell Co.*, 695 F.2d at 39 (observing that defendants' discriminatory act prevented "any number of [disabled] persons" from "receiv[ing] rehabilitation" in the future). The Complaint alleges a repeated failure by several School District officials—including a counselor, an acting principal, several principals, and the superintendent, *see, e.g.*, Am. Compl. ¶¶ 23, 28, 44, 56–59, 61–63, 66—to respond to student and parent requests to remedy the victimization some students suffered at the hands of other students. And the School District ignored the repeated offer of free educational programming on domestic and dating violence by the YWCA's Rape Crisis Program, programming allegedly received by every other school district in Niagara County. These alleged failures support the plausible inference that the School District's inaction is likely to continue and affect additional future victims.

Third, the School District's failures indirectly affect both its entire student body and the students' parents in several ways. One such alleged effect was that the School District's inaction permitted the harassing behavior to spread from a handful of perpetrators to a significant number. In T.G.'s case, her rape by E.D.

28

was followed by other students sending her a picture of E.D. with the caption "your boyfriend," Am. Compl. ¶ 26, sending T.G. text messages suggesting she had enjoyed what E.D. had done to her, and telling T.G. to "watch her back," *id.* ¶ 28.  In A.S.'s case, five High School sophomore girls displayed a poster telling A.S. "We don't want you" at a school-wide pep rally.  *Id.* ¶ 54.  A video recording collecting remarks that were insulting to A.S. was distributed among the High School students.  And in both C.C.'s and L.W.'s cases, their gender-based harassment was perpetrated by groups of students.  In short, for each of the four students, the OAG's allegations show how the School District's failure to act allowed more and more students to turn into harassers.

The broader alleged effects on the students in the School District—and, indeed, their parents—do not stop there.  *11 Cornwell Co.* and *Snapp* explicitly recognized the harmful effects wrought on a community by the alleged discriminatory acts of a small subset of its members.  *See 11 Cornwell Co.*, 695 F.2d at 39 ("Both [the disabled] persons and community residents"—including the alleged discriminators—would be "deprived of being able to live in integrated communities."); *Snapp*, 458 U.S. at 609 (concluding that, despite limited economic impact, "[d]eliberate efforts to stigmatize the labor force as inferior carry a

universal sting" (internal quotation marks omitted)).  Here, the Complaint

explicitly alleges how, after the School District's inaction in response to T.G.'s

requests to be kept separate from E.D. became more widely known, T.G.'s

mother received over one hundred messages on social media from concerned

parents, and how the students of the High School staged a related walkout.  One

student at the walkout allegedly confronted the principal with the rhetorical

question whether "[a]llowing all of us girls to be in danger is civil?"  Am. Compl.

¶ 39.  Because of this allegedly widely-known incident, students had to contend

with the fear that, if something comparable happened to them, the School

District would also leave them unprotected.  In sum, the effects on the student

and parent community flowing from the School District's alleged inaction are at

least as palpable and pervasive as the alleged conspiracy to deny housing to the

disabled addressed by this Court in *11 Cornwell Co.*

We therefore conclude that the OAG has pleaded sufficient facts to

support the inference that a substantial segment of the state's population has

been affected by the School District's challenged conduct.  Because the parties

agree that the OAG has made the other two showings required for *parens patriae*

standing—pleading a quasi-sovereign interest and an inability by individual

plaintiffs to obtain complete relief, *see Griepp*, 991 F.3d at 131—we reverse the

district court's judgment dismissing this case for lack of *parens patriae* standing.

## II.   Merits

The School District argues that, even if we conclude that the district court

erred in holding that the OAG lacked *parens patriae* standing, we should

nonetheless affirm on the alternative basis that the Complaint fails to state a

plausible Title IX claim.

We decline that invitation.  While "[w]e may affirm on any ground with

support in the record, including grounds upon which the district court did not

rely," *Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) (internal

quotation marks and citation omitted), *cert. denied*, 143 S. Ct. 1056 (2023), "this

Court's usual practice [is] to allow the district court to address arguments in the

first instance," *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97 (2d Cir. 2015)

(citation omitted); *see also Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d

Cir. 2003) (same); *Farricielli v. Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000) (same).

Indeed, we have previously declined to reach the merits of a motion to dismiss

for failure to state a claim where, as here, the appellee advanced the argument as

an alternative ground for affirming dismissal. *See, e.g., Absolute Activist Value*

*Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012) (remanding to consider

merits of motion to dismiss in first instance); *Henriquez v. Starwood Hotel Resorts*

*Worldwide Inc.*, 549 F. App'x 37, 38 (2d Cir. 2014) (summary order) (same).

Moreover, the district court here has the benefit of an R&R providing a

recommendation on how to resolve this question.  We therefore see no reason to

deviate from our preferred practice.

## III.  Leave to Amend the Complaint

Because we have determined that the district court should assess the

merits of the OAG's allegations in the first instance, the issue of whether the

court abused its discretion in denying leave to amend is moot.  Of course, the

issue may arise again should the district court dismiss the Complaint on the

merits, without permitting further leave to amend, and we may decide it in the

event that this case reaches us again on appeal.

## CONCLUSION

We have considered the parties' remaining arguments on appeal and

conclude that they are without merit.  For the foregoing reasons, we REVERSE

the district court's judgment dismissing the case for lack of *parens patriae*

standing and REMAND for further proceedings consistent with this opinion.